703 N.E.2d 644 (1998)
Ralph KIRCHOFF and Wilma Kirchoff, Appellants (Defendants/Counterclaimants Below),
v.
Jeff W. SELBY and Diane L. Selby, Appellees (Plaintiffs/Counterdefendants Below).
No. 26S01-9812-CV-760.
Supreme Court of Indiana.
December 8, 1998.
*645 Patrick A. Shoulders, Robert L. Burkart, Evansville, for Appellants.
Dean E. Richards, Indianapolis, for Appellees.

ON PETITION TO TRANSFER
BOEHM, Justice.
This case deals with the liability of sellers and others under the Indiana Securities Act (the "Indiana Act"). In view of the significant differences between the Indiana Act and § 12 of the Securities Act of 1933, we hold that the elements of a claim under § 19 of the Indiana Act are different in several respects, notably that Indiana law specifically permits recovery under some circumstances from categories of persons different from those in federal securities laws.

Factual and Procedural Background
By the mid 1980's Ralph Kirchoff had served as chairman of the board of Worthington State Bank (the "Bank") for over a decade. Ralph and his wife, Wilma, (the "Kirchoffs") owned 992 shares or 49.6% of the 2000 outstanding shares of Bank stock. In 1986, the Board of Directors of the Bank hired Douglas Austin & Associates to value the Bank and prepare a prospectus to facilitate its sale. The prospectus was circulated to various persons including Mark Van Eaton, then a stock broker with City Securities Corporation of Indianapolis. In August 1987, Van Eaton made an offer to purchase all 2,000 outstanding shares of the Bank's stock.
The Transactions
Van Eaton then incorporated Worthington Bancshares, Inc. (the "holding company") for the purpose of acquiring the Bank's 2,000 outstanding shares. Van Eaton was the sole director and officer of the holding company. Van Eaton acquired 1,300 shares of the 2,000 authorized shares of the holding company for a total of $1,000 or 77¢ per share. Over the next year the holding company sold additional shares of its own newly issued stock for *646 $2,300 each, and also exchanged some of its newly issued shares for Bank shares on a one for one basis.[1] The holding company also borrowed $2,570,000 from Summit Bank. Ultimately, the cash raised in these transactions was used to acquire all 2,000 shares of the Bank's stock at $2,300 each.
At the end of these transactions, some of which are described in more detail later, the holding company had shareholders in five groups:
(1) Van Eaton, who acquired 65% of the equity for $1,000;
(2) former shareholders of the Bank who received cash for part of their Bank shares and also exchanged some Bank shares for holding company shares on a one to one basis;
(3) one Bank shareholder who exchanged all of his 1.25% of the Bank for 1.25% of the holding company;
(4) one Bank shareholder who exchanged all of his 1.25% of Bank shares for holding company shares and also purchased an additional 3% of the holding company for $138,000 cash; and
(5) Jeff and Diane Selby (the "Selbys"), who furnished cash (all of it borrowed from either the Bank or the Kirchoffs) in the amount of $494,500 for 10.75% of the holding company.
Category (2) included the Kirchoffs who had owned 49.5% of the Bank and ended up with 13.75% of the holding company, $1,749,391 in cash and $630,000 in notes. All of those who exchanged shares received the same number of shares and percentage ownership in the holding company as they had held in the Bank, but their interests were now junior to the $2,570,000 debt to Summit Bank.
The Selbys acquired 215 of the 700 shares the holding company sold, but the route they took to that result is disputed. For reasons explained below, the parties contend that important legal results depend on whether the Selbys bought securities from the Kirchoffs or from the holding company. As also explained in more detail later, the paper trail is ambiguous on this issue as well as many others. There are plainly notes from the Selbys to the Kirchoffs for $244,000 and to the Bank for $250,000. The Kirchoffs contend that the Selbys purchased 215 newly issued shares (10.75%) of the holding company, and never bought shares from the Kirchoffs. Under this version, (1) the Selbys borrowed $250,000 from the Bank, (2) the Selbys borrowed $244,500 from the Kirchoffs, (3) the Selbys paid the total of $494,500 to the holding company to purchase their holding company shares and (4) the Selbys pledged the resulting 215 shares of the holding company to the Kirchoffs as security for the $244,500 note.
The Selbys maintain that they purchased 215 shares of the Bank directly from the Kirchoffs and later exchanged the Bank shares for shares in the holding company. They contend that the $244,500 note to the Kirchoffs and the loan proceeds of their $250,000 note to the Bank were the payment of the purchase price of Bank stock from the Kirchoffs. In support of this view the Selbys point to a "Stock Exchange and Subscription Agreement," of which more later. It is sufficient at this point to note that there is no document that directly supports a transfer of shares from the Kirchoffs to the Selbys.
The Kirchoffs are also unable to point to any document that conclusively supports their view that the Selbys purchased holding company shares in a Kirchoff-free transaction. They assert inferential support in the fact that the Bank's stock transfer ledger contained no record that any shares of the Bank were ever owned by the Selbys. The Kirchoffs also assert that the checks written by the Bank and the Kirchoffs evidence the proceeds of the loans to the Selbys and were endorsed by the Selbys to the holding company and deposited in its account at Summit bank. Some but not all of these checks are in the record.
However the parties arrived at that point, by November 1988, the holding company had *647 obtained all of the 1,008 shares of Bank stock not owned by the Kirchoffs. The Kirchoffs' 992 shares of Bank stock were then transferred to the holding company and the holding company surrendered all of the certificates for Bank shares in exchange for a single certificate registered in the holding company's name for all 2,000 shares. This was then pledged as security for the holding company's loan from Summit Bank. At the same time, the Kirchoffs lent $630,000 to the holding company to finance its acquisition of Bank shares.
Operations under Van Eaton
In December 1988, Van Eaton replaced Ralph Kirchoff as Chairman of the Board of the Bank. Van Eaton operated the Bank, at times with Kirchoff's help, until the Bank was seized by the Indiana Department of Financial Institutions ("DFI") on November 19, 1991 and the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver. In 1993, the FDIC initiated three administrative enforcement actions against Van Eaton, individually and as the Bank's officer and director. These alleged unsafe and unsound banking practices, breaches of fiduciary duty, excessive salary and bonus payments without board approval and willful disregard for the Bank's safety and soundness. These proceedings were ultimately settled by consent decrees that, inter alia, prohibited Van Eaton from further participation in the affairs of a financial institution.
The Trial
After the DFI seized the Bank, the Selbys sued the Kirchoffs. The Selbys' complaints asserted common law claims for fraud and breach of fiduciary duty and a claim for deception under Indiana Code § 35-43-5-3. Ultimately claims under the Indiana Securities Act were added, albeit in a rather oblique manner described in Part II.G. The Kirchoffs counterclaimed for the Selbys' default on the $244,500 promissory note. After a two week trial, the jury returned a verdict in favor of the Selbys for $730,000 and against the Kirchoffs on their counterclaim on the note.
Post Trial Developments
Shortly after trial, Donna Fink, a paralegal employed by the Selbys' attorney, Dean Richards, contacted Bruce Kirchoff, the Kirchoffs' son and an attorney. Fink met with Bruce Kirchoff and told him that she had assisted Richards in altering documents introduced into evidence at the trial. Specifically, Fink stated that she assisted Richards, Jeff Selby and Van Eaton in altering the "Stock Exchange and Subscription Agreement" by using whiteout to cover portions of the document, photocopying it, and tracing signatures onto the manufactured document. Fink also stated that shortly after a copy of the Bank Prospectus was admitted at trial as Exhibit 10, she had witnessed the Selbys and their attorney alter it in several critical respects, including removing some unspecified pages. The altered document was then offered and admitted at trial as Exhibit 12 to support the theory that Ralph Kirchoff failed to disclose the Bank's troubled loans. Fink also said she was present when the Selbys, Richards and Van Eaton rehearsed false testimony.
In the meantime, the Selbys, in what may have been an attempted preemptive strike, filed a post trial motion for sanctions, requesting that a disciplinary action be initiated, and for assessment of damages and attorney fees against Ralph Kirchoff and his attorney, alleging that they had improperly communicated with the trial judge and had filed affidavits and documents prior to trial that Ralph Kirchoff admitted at trial were incorrect.
Based on the claim of altered evidence, the Kirchoffs filed a motion to correct error and requested a new trial. In the alternative, they moved for judgment on the evidence on the grounds that the Selbys failed to prove several elements of a claim under the Indiana Act, including privity between purchaser and seller, a purchase of the stock for value and the existence of a legal loss. The trial court heard evidence on October 30 and 31, 1995 on the Selbys' motion for sanctions and the Kirchoffs' motions to correct error and for judgment on the evidence. The court denied the Kirchoffs' motion for judgment on the evidence, granted the Kirchoffs' motion to correct error, set aside the jury verdict and ordered a new trial. The court *648 also granted the Kirchoffs' motion to dismiss the Selbys' request for disciplinary action.
The Appeal
The Kirchoffs appealed the trial court's denial of their motion for judgment on the evidence. The Selbys cross appealed, asserting that the trial court erred by setting aside the jury verdict, granting the Kirchoffs' motion for a new trial and dismissing their request for disciplinary action against Ralph Kirchoff and his attorney.
The Court of Appeals held that:
(1) the trial court did not err in setting aside the jury verdict and granting a new trial based on newly discovered evidence;
(2) Indiana's Act requires that a plaintiff purchaser such as the Selbys show either privity with the seller or that the Kirchoffs solicited the purchase by the Selbys to serve their own or the Bank's financial interest;
(3) value was given for stock;
(4) the Selbys suffered a legally cognizable loss;
(5) the pledge of the holding company stock to the Kirchoffs satisfied the tender requirements of a claim under § 19(a) of the Indiana Act; and
(6) the trial court properly dismissed the Selbys' motion for sanctions.
Kirchoff v. Selby, 686 N.E.2d 121 (Ind.Ct. App.1997). In deciding that Indiana law requires either privity or a successful solicitation with a financial motive, the Court of Appeals held that liability under § 19 of Indiana's Act is coextensive with liability under § 12 of the Securities Act of 1933 as fleshed out by the Supreme Court's decision in Pinter v. Dahl, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). We grant transfer because we conclude that certain aspects of the Court of Appeals' opinion as to the Indiana Act require clarification.

I. Disposition of this Appeal
The Kirchoffs' appeal contends that they are entitled to judgment on the evidence. The Selbys contend that the trial court erred in a number of respects, notably in granting the Kirchoffs' motion for a new trial. We affirm the trial court in both appeals.
A. Standard of Review
The standard of review for a challenge to a ruling on a motion for judgment on the evidence is the same as the standard governing the trial court in making its decision. Bals v. Verduzco, 600 N.E.2d 1353, 1357 (Ind.1992). Judgment on the evidence is proper only "where all or some of the issues ... are not supported by sufficient evidence." Ind. Trial Rule 50; Benante v. United Pacific Life Ins. Co., 659 N.E.2d 545 (Ind.1995) (if there is evidence allowing reasonable people to differ as to result, judgment on the evidence is improper). The court looks only to the evidence and the reasonable inferences drawn most favorable to the non-moving party and the motion should be granted only where there is no substantial evidence supporting an essential issue in the case. Clark v. Wiegand, 617 N.E.2d 916, 918 (Ind.1993); Bals, 600 N.E.2d at 1357.
The Selbys' challenge to the grant of a new trial, however, is governed by a highly discretionary standard. Whether to grant a new trial on the grounds of newly discovered evidence is within the discretion of the trial court and an appellate court will reverse only for abuse of that discretion. Kimmel v. State, 275 Ind. 575, 583, 418 N.E.2d 1152, 1157 (1981); Schuh v. Silcox, 581 N.E.2d 926, 927 (Ind.Ct.App.1991) (an abuse of discretion is found where the trial court's actions are clearly erroneous; against the logic and effect of the facts before it).
B. Kirchoffs' Motion for Judgment on the Evidence
The Kirchoffs contend that they are entitled to judgment on the evidence because the Selbys failed to prove each element of a claim under Indiana Code § 23-2-1-19. Specifically, the Kirchoffs argue that there is no evidence that (1) the Kirchoffs sold Bank stock to the Selbys; (2) the Selbys purchased the stock for value; or (3) the Selbys suffered a compensable loss because the Selbys did not tender the Bank stock to the Kirchoffs as required under § 23-2-1-19(a). Finally, even if the Selbys had tendered the *649 stock, they could not prove damages because they received equivalent value when they exchanged the Bank stock for the holding company stock. They contend that each of these is required to support the Selbys' claim under Indiana's Act. The Kirchoffs assert that the Selbys' claim is a disguised claim for diminution of their holding company stock which must be asserted against the holding company or by the holding company against the Bank or the Kirchoffs.
Addressing the merits of the Kirchoffs' motion for judgment on the evidence requires a determination of the validity of the exhibits allegedly manufactured by the Selbys and the credibility of the witnesses who testified to their authenticity or lack thereof. We agree that an examination of some of the documents in this record raises a number of questions of both form and substance. Indeed some of these documents are incomprehensible. The "Stock Exchange and Subscription Agreement" described above purports to be a subscription to Bank shares. A "subscription" agreement is usually understood to relate to an undertaking to buy newly issued shares from the corporation. Yet this document is dated at a time when, according to the record, the Bank had no authorized but unissued shares. The Selbys do not explain whether these were to be newly issued Bank shares, or, if this document was truly a subscription, how it relates to shares already issued to the Kirchoffs. The document is signed by the Selbys and by Van Eaton as Chairman of the holding company but not by the Kirchoffs or anyone purporting to be an officer of the Bank. If it is an erroneously titled agreement to subscribe to holding company stock, which would make more sense in some respects, we are given no explanation of how it supports the proposition that the Kirchoffs, who are not signatories, bought or sold anything pursuant to it. This "Subscription Agreement" includes some of the representations typically found in documents intended to qualify the subscribers as accredited investors to exempt the transaction from the registration requirements (but not the antifraud provisions) of both the Securities Act of 1933[2] and the Indiana Act. The second page, in a font that appears somewhat different from that on the first page, contains an apparent agreement by the Selbys to exchange Bank shares for holding company shares at such time as the Bank pays $250,000 to the Kirchoffs, who are not parties to the document. Although it apparently contemplates that funds will flow from the holding company to the Kirchoffs it does not on its face obligate the Kirchoffs to do anything.
What to make of all of this is best left to the trier of fact who is in a position to judge the veracity of witnesses. It is impossible to reach a conclusion with any confidence based on the paper record before this Court. Accordingly, we leave it to the trial court to sort this out and summarily affirm the Court of Appeals' decision to affirm the trial court's denial of the motion for judgment on the evidence.
C. A New Trial was Properly Ordered
We summarily affirm the holding of the Court of Appeals that the trial court's grant of a new trial was well within its discretion. Ind. Appellate Rule 11(B)(3).

II. Issues under the Indiana Securities Act for Retrial
The Court of Appeals expressed its view of several issues under the liability section of the Indiana Act. We agree with some but not all of the Court of Appeals' conclusions. Because the issue of the Kirchoffs' liability under this statute will presumably come up again at the new trial, we address the scope of liability under Indiana Code § 23-2-1-19.
In 1961, Indiana adopted the 1956 Uniform Securities Act. Acts 1961, c. 333, §§ 101 to 509; see BURNS IND. STAT. ANN. §§ 25-854 to 25-879 (1970). The Act is now codified at Indiana Code §§ 23-2-1-1 to -25 (1998). The Selbys allege that the Kirchoffs' preparation of the Bank prospectus and its disclosures with respect to the Bank's loan portfolio violated § 12 of the Act. That section states:

*650 It is unlawful for any person in connection with the offer, sale or purchase of any security, either directly or indirectly, (1) to employ any device, scheme or artifice to defraud, or (2) to make any untrue statements of a material fact or to omit to state a material fact necessary ... or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.
IND.CODE § 23-2-1-12 (1998). Although § 12 defines the conduct constituting a violation, it does not expressly create a private right of action.[3]
A. Privity under § 19(a)
The civil liability provision of the Uniform Act adopted in 1961 is now found in § 19 of the Indiana Act. For purposes of this case, it is essentially the same today as the version enacted in 1961. Subsection 19(a) imposes liability, subject to certain defenses, on "a person who offers or sells a security in violation of the Act." The seller or offeror is liable to "any other party to the transaction." "Transaction" is a defined term. It in turn includes "purchase," also a defined term, which includes the "direct or indirect" "acquisition" of a security. Id. §§ 23-2-1-1(i)(3)-(4). As a result of these nested definitions, § 19(a), when read literally in conjunction with the definitions in § 1 suggests that a seller may be liable to someone other than the person to whom title is passed. For example, reading "acquisition" literally, one who sells securities to a holding company could be viewed as liable to a purchaser of holding company shares as one who "indirectly" acquired the security.
However, the remedy provided by § 19(a) requires that the successful claimant either "rescind the transaction" or "recover the consideration paid" or recover damages "if the security is no longer owned." Each of these seems rather plainly to contemplate that a seller or offeror is liable only to a person who acquired the same security that was offered or sold. Accordingly we agree with the Court of Appeals that § 19(a) requires either privity between the seller and purchaser, or that the person charged have offered the security to the purchaser. We also agree with the Court of Appeals that the legislature did not intend for a remote purchaser of securities "to have a cause of action against any seller within the chain of title," i.e. if A sells to B who resells to C, as a general proposition, C's recovery is against B, not A. Kirchoff v. Selby, 686 N.E.2d 121, 129 (Ind.Ct.App.1997). This is not the end of the story, however.
B. Potential Liability under other Subsections of § 19
Section 19 is based on § 410 of the Uniform Act, which in turn is based on § 12 of the Securities Act of 1933. Based on this genealogy of § 19(a), the Court of Appeals concluded that civil liability under the Indiana Act was essentially the same as under § 12 as explained in Pinter v. Dahl. 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). In that case, the U.S. Supreme Court construed "seller" under § 12(1) of the Securities Act of 1933 (which creates liability for unregistered sales) to impose liability only on offerors or sellers who pass title or "successfully solicit" a purchase and are motivated at least in part by "a desire to serve [one's] own financial interests." Id. at 647, 108 S.Ct. 2063. The same term presumably has the same meaning under § 12(2), the antifraud provision that is the legislative parent of Indiana's § 19(a). There are, however, important differences between the language of Indiana's § 19 and federal § 12 that clearly anticipate somewhat different liability under the two statutes. Section 12 deals only with remedies against those who sell or offer. In addition to § 19(a), Indiana's § 19 includes three subsections not found in the federal statute. Subsection 19(b) gives those who sell securities similar remedies against purchasers who violate the Act and § 19(c) deals with remedies against investment advisors. Finally, and significantly for this case, § 19(d) imposes liability for violations *651 of the Act on several other categories of potential defendants.
1. Potential Liability under § 19(d)
Section 19(d) provides:
A person who directly or indirectly controls a person liable under subsection (a), (b), or (c), a partner, officer, or director of the person, a person occupying a similar status or performing similar functions, an employee of a person who materially aids in the conduct creating liability, and a broker-dealer or agent who materially aids in the conduct are also liable jointly and severally.. . .
IND.CODE § 23-2-1-19(d) (1998).
This provision imposes derivative liability on five groups. Some of these have exact parallels to, or are substantially similar to, provisions in the federal securities laws, but some are quite different from the federal statute. The five are:
(1) each person who directly or indirectly controls a person liable under subsection (a), (b), or (c);
(2) each partner, officer, or director of the person;
(3) each person occupying a similar status or performing similar functions;
(4) each employee of a person who materially aids in the conduct creating liability; and
(5) each broker-dealer or agent who materially aids in the conduct.
Id. § 23-2-1-19(d); see also Paul J. Galanti, Business Associations, 14 IND. L.REV. 91 (1981).
2. Officers, Directors, Partners and Controlling Persons
As the Court of Appeals held in Arnold v. Dirrim, 398 N.E.2d 426 (Ind.Ct.App. 1979), only the fourth and fifth categories require personal participation in the transaction. The statute does not require a partner, officer, director or controlling person to materially aid a violation to be liable.
[I]t seems apparent that this statutory provision imposes absolute liability upon the director of a corporation to purchasers of securities sold in violation of the Securities Act based on his position as a director unless he proves the statutory defense. It should be observed that the clause in question [materially aids] obviously relates only to employees of the seller, broker-dealers or agents.
Id. at 433-34. Other jurisdictions have construed statutes identical to Indiana Code § 23-2-1-19(d) in a similar fashion. See Moerman v. Zipco, Inc., 302 F.Supp. 439 (E.D.N.Y.1969), aff'd 422 F.2d 871 (2d Cir. 1970) (employee must materially aid the sale to be liable but there are no restrictions on the liability of a partner, officer or director); Foelker v. Kwake, 279 Or. 379, 568 P.2d 1369 (1977) (personal participation not necessary to impose liability on officer of corporation); Mitchell v. Beard, 256 Ark. 926, 513 S.W.2d 905 (1974) (an employee, broker or agent must materially aid in the sale before becoming liable, but that requirement is not applicable to a partner); Rzepka v. Farm Estates, Inc., 83 Mich.App. 702, 269 N.W.2d 270 (1978) (directors and officers liable where they did not establish statutory defense of lack of knowledge).
3. Employees, Broker-dealers and Agents
The Indiana Act explicitly creates liability for employees, agents and broker-dealers, but only if they "materially aid[ ] in the conduct creating liability." IND.CODE § 23-2-1-19(d) (1998). Whether a person is an officer or director, a controlling person, or an employee is a question of fact governed by common law. In contrast, "agent" and "broker-dealer" are defined terms, and the determination of who is an agent or broker-dealer is governed by the statute.
In particular, an "agent" is "an individual, other than a broker-dealer, who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." Id. § 23-2-1-1(b). Accordingly, common law agents for some purposes are not necessarily "agents" as used in the statute. In Johnson v. Colip, 658 N.E.2d 575, 577 (Ind.1995), this Court found a material issue of fact as to whether an attorney who represented a corporation was an agent under the Act.

*652 The definition of "agent" ... does not include attorneys who merely provide legal services, draft documents for use in the purchase or sale of securities, or engage in their profession's traditional advisory functions. To rise to the level of "effecting" the purchase or sale of securities, the attorney must actively assist in offering securities for sale, solicit offers to buy, or actually perform the sale.
Id. at 578 (quoting Baker, Watts & Co. v. Miles & Stockbridge, 95 Md.App. 145, 620 A.2d 356, 368 (1993)).[4] Although the Court found that an attorney must go beyond legal representation to be an agent, factual issues such as whether the attorney's conduct at "a meeting with potential investors made it more likely than not that the investors would purchase securities" precluded summary judgment in favor of the attorney. Id.
4. Conduct that "Materially Aids" a Violation
This Court has not addressed what conduct amounts to "material aid" under the Indiana Act. By 1994 the federal courts had developed a very substantial body of law dealing with the liability of those who aid or abet a violation of the federal securities laws.[5] However, in that year the Supreme Court made clear that neither the Securities Act of 1933, 15 U.S.C. § 77l (1994 & Supp. II 1996), nor the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1994 & Supp. II 1996), nor Rule 10b-5, 17 C.F.R. § 240.10b-5 (1998), supports a claim against aiders and abettors. In Central Bank v. First Interstate Bank, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Court concluded that the text of section 10(b) of the Securities Exchange Act did not reach those who aid and abet a 10(b) violation and held that a private plaintiff may not maintain an aiding and abetting suit under § 10(b).
It is inconsistent with settled methodology in 10(b) cases to extend liability beyond the scope of the conduct prohibited by the statutory text. To be sure, aiding and abetting a wrongdoer ought to be actionable in certain instances. The issue, however, is not whether imposing civil liability on aiders and abettors is good policy but whether aiding and abetting is covered by the statute.
Id. at 176, 114 S.Ct. 1439. As already noted, Pinter foreclosed most forms of aider and abettor liability under § 12 of the 1933 Act. Although these two decisions preclude private civil actions based on aider and abettor liability under the 1933 and 1934 Acts,[6] each expressly rests on the language of the relevant federal statute, and neither federal provision expressly authorizes aider and abettor liability.
In contrast to federal securities laws, Indiana's Act expressly imposes liability on employees, agents and broker-dealers who "materially aid" in the conduct creating liability. Neither the Court of Appeals nor the parties addressed this provision or its application to the facts of this case. Accordingly, we express no opinion on the conduct necessary to materially aid or the application of this section to the complex facts of this case.[7] *653 Like § 19(c), however, § 19(d) plainly permits recovery under some circumstances from persons who are not sellers to the plaintiff purchaser.
C. "Participation" in a Transaction is not a Freestanding Basis for Liability under 19(a)
The Court of Appeals expressed the view that the term "indirect" as it appears in the definition of "purchase" refers to potential defendants who "indirectly sell securities by participating in or soliciting their sale." Kirchoff, 686 N.E.2d at 129. The inclusion of "direct or indirect" in the definition of "purchase" does not appear in the Uniform Act and seems to be unique to Indiana's Act.[8] Indiana and other states also refer to controlling persons as those in "direct or indirect" control of a person liable. The same phrase originated in federal law as it related to "direct or indirect" use of the mails, a jurisdictional requirement that is irrelevant in state securities laws.
We do not believe "direct or indirect" in the definition of "purchase" relates to participation in the sale. "Participation" in a transaction is to some extent a term of art in securities laws. It was at one time used to describe the class of liable persons under Indiana's Act. "[T]he person making such sale or contract for sale and every officer, director or agent of or for such seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable." BURNS IND. STAT. ANN. § 25-847 (1960 Replacement). In some states the counterpart of § 19(d) includes those who "participate." See OR.REV.STAT. § 59.115(3) (1995) (every person who participates or materially aids in the sale is also liable). This difference has been the basis of significantly different scope of liability of peripheral players. Compare Prince v. Brydon, 307 Or. 146, 764 P.2d 1370 (1988) (attorney who prepared documents may be liable under statute imposing liability on those who "participate or materially aid" in a sale) with Agapitos v. PCM Investment Co., 809 F.Supp. 939 (M.D.Ga.1992) (attorneys who prepare documents, without more, are not agents who materially aid a sale). However, "participate" was removed from the predecessor of § 19 in 1961 when the Uniform Act was adopted in Indiana. At the same time, what is now found at § 19(d) was added, and covers this ground with more precision.
Section 19 in its current version contains a rather detailed iteration of categories of persons liable and the different degrees of involvement required of them. "Participant" or "participate" is not among either. As a result, we conclude that participation becomes relevant to these categories only to the extent that it is relevant to establishing that one fits into the categories. Thus if *654 one's "participation" amounts to selling or offering under § 19(a), or to "materially aiding" under § 19(d), it is relevant. But participation adds nothing to these statutory categories. Otherwise stated, Indiana's omission of "participation" leaves free from statutory liability under § 19 peripheral players such as attorneys or accountants, unless they offer or sell, or fit one of the other categories. We conclude that "participation" as it is sometimes broadly construed is insufficient to impose liability under Indiana's Act.
D. Tender
The Kirchoffs argue that the Selbys are not entitled to a remedy because they failed to tender the security to the Kirchoffs as required by Indiana Code § 23-2-1-19(a). The Court of Appeals held that the Selbys' pledge of the holding company shares to the Kirchoffs was sufficient to satisfy the tender requirement. Kirchoff, 686 N.E.2d at 131 n. 11. However, a tender requires an offer to transfer title, not merely possession. "Tender" is an "unconditional offer to perform." BLACK'S LAW DICTIONARY 1467 (6th ed.1991). Accordingly, the Selbys' pledge of their holding company shares as collateral for the $244,5000 note from the Kirchoffs does not satisfy the tender requirements of the statute because it is not an unqualified offer to put the shares to the Kirchoffs. However, tender "may be made at any time before entry of judgment." IND.CODE § 23-2-1-19(e) (1998); Kelsey v. Nagy, 410 N.E.2d 1333, 1337 (Ind.Ct.App.1980). It may be made in the complaint. 69A AM. JUR.2D Securities Regulation-State § 224 n. 30 (collecting cases). In any event, it becomes a formality that can be cured at any time prior to judgment.
E. Corporate Formalities
The Kirchoffs correctly cite a number of propositions of corporate law. Among these are that a subscription agreement is an agreement to acquire newly issued shares from the issuer, not to transfer issued and outstanding shares between existing shareholders. They also point out that the stock transfer records of the Bank are the proper place to record any transfer of bank shares from an existing shareholder or the issue of any new Bank shares to the Selbys. However, the Indiana Securities Act, like most securities regulatory statutes, does not hinge on compliance with corporate law requirements. A "security" is not only the stock or the certificate that evidences it. Rather, a "right to subscribe to or purchase" any of the listed items such as stock or bonds is itself a "security" by reason of the definition in the Act. IND.CODE § 23-2-1-1(k) (1998). Thus, although plainly relevant, neither the name given to the document nor the absence of the corporate documentation of the issuance or transfer of shares is conclusive as to whether a security was purchased for value and if so by whom from whom.
F. Legal Loss
The Court of Appeals held that the Selbys may have suffered a legal loss in the form of a decrease in the sale of their holding company stock as a result of the misrepresentations with regard to the Bank. If the Bank's financial condition was misrepresented within the meaning of the Indiana Act as of the time of the sale, the statute gives the buyer of the security (whether Bank or holding company shares) the right to recover the purchase price from the persons liable. "Legal loss" is not an element of the claim. Moreover, the holding company was apparently capitalized by, in effect, funding the 65% dilution created by Van Eaton's stock with debt to Summit Bank and a resulting subordination of the equity position of the existing shareholders. We cannot say as a matter of law that this in itself could not constitute a sizeable loss to exchanging or purchasing shareholders.
Finally, we are told that the holding company, according to its books, operated successfully for two years before seizure. If true, this is relevant, but not conclusive as to whether the shares were of equal value at the time of the exchange. Whether the losses resulting in the seizure were the product of accounting practices or operating procedures that predated the exchange but were discovered only later is a fact issue as well.
*655 G. Liability in this Case
Information material to an evaluation of the Bank was also plainly material to investors in the holding company, which was expected to have no assets other than the Bank. Unresolved questions of fact as to the accuracy of the information in the Bank prospectus, and the role of the Kirchoffs in these events preclude reaching a determination on these issues by this Court. As the parties and the Court of Appeals concluded, if the Kirchoffs sold to the Selbys they may be liable under § 19 as sellers if a violation of § 12 is established. However, the Kirchoffs (or Ralph Kirchoff) may also be liable under § 19(c) or § 19(d) whether or not either or both of them is a seller or offeror with § 19(a) exposure. This will turn on whether either or both is found to be in one or more of the statutory categories with respect to the issuer (whether it is the Bank or the holding company), and if an "agent," whether "material aid" was furnished to a violation. The Kirchoffs apparently financed the Selbys' purchase of Bank shares or holding company shares. Whether this or other contact with the Selbys or other activity in connection with these transactions constituted "representation" of an "issuer in effecting or attempting to effect purchases or sales of securities" on behalf of the holding company is an issue for trial. Similarly, what if any role either Kirchoff had in any actual offer or solicitation is unclear.
As the Court of Appeals noted, if the Kirchoffs have liability as a result of the Selbys' transactions with the holding company, either a derivative action or an action under the close corporation doctrine of Barth v. Barth, 659 N.E.2d 559 (Ind.1995), is procedurally possible. See Kirchoff, 686 N.E.2d at 130 & n. 10. Whether there was any such transaction and whether the facts support any such claim is for the trial court to conclude.
Finally, we are unclear whether all or any of these theories other than liability as sellers of Bank shares should be available to the Selbys on retrial. The Kirchoffs' arguments proceed on the assumption that the Selbys rely solely on § 19(a). Perhaps that is a fair inference, but we leave it to the trial court to determine the extent to which liability under § 19(d) or the assertion of any other theory should be permitted on retrial.
The Selbys moved for leave to file a "Second Amended Complaint" on July 19, 1993. In the supporting memorandum, they specified that the amendment would add "I.C. XX-X-X-XX, I.C. XX-X-X-XX.1, I.C. XX-X-X-XX and I.C. XX-X-X-XX." These are the antifraud and civil liability sections already discussed and the sections dealing with fraud by investment advisors and prohibiting misleading statements about a registered offering. Subsequently, the Chronological Case Summary recites that the trial court ordered "that the plaintiff is to file within five days a full, non-interlineated complaint." On September 8, 1993 a "Second Amended Complaint" was filed, but it, like its predecessors, contains no reference to a securities law claim. There is no further amendment to the pleadings apparent from the record. The Kirchoffs observe in their brief that no securities law claim was ever pleaded. However, we take it from the foregoing and from the instructions discussed below, that either by reason of the motion quoted above or by reason of Trial Rule 15(B), some form of securities law claim was injected into this case.
Unfortunately, we cannot determine what that claim was. The jury was instructed on the substance of § 12 of the Indiana Act. There was no instruction as to the need, or lack thereof, of some form of privity or role in the sale on the part of either of the Kirchoffs. There was also no instruction on aiding or abetting, controlling persons, or persons holding roles as, or equivalent to, officers and directors of the seller, whether that seller was the holding company or the Bank. Finally, there was no instruction on any aspect of § 19, so we are unclear whether only subsection 19(a) was in play or whether other subsections as well could fairly be treated as footings for the Selbys' claims. It is principally up to the plaintiffs to define their cause of action, so we cannot fault either the trial court or the defendants for this lack of clarity. However, the trial court is far better positioned than we to evaluate what, if any of these claims was fairly presented by the Selbys, and which of them, if *656 any, should be permitted to be asserted in any retrial.

III. The Form of this Appeal
Indiana Appellate Rule 8.2 sets forth the required form and 8.3 the required content of appellate briefs. However, as elaborated below, the Selbys' brief violates several provisions of the rules, including even the most rudimentary of them.
The brief violates Appellate Rule 8.2(A)(1) in that it is not double spaced and uses a typeface smaller than 12 point. The arrangement and content of briefs is governed by Rule 8.3(A)(5). It requires a "statement of facts relevant to the issues presented for review with appropriate references to the record." The Selbys' statement of facts does not comply with this rule because it neither discusses the facts relevant to the issues presented for review nor presents the facts in an objective and nonargumentative manner. As the Court of Appeals in this case noted "the Selbys' brief is filled with improper, anecdotal facts which are not part of the record and have no bearing on this appeal." Kirchoff v. Selby, 686 N.E.2d 121, 125 n. 3 (Ind.Ct.App.1997). Indeed, as the Kirchoffs point out, the Selbys' rendition of the facts contains several "facts" directly contradicted by the record.[9] It contains many other flat declarative statements that are at best an advocate's characterization at odds with the physical evidence without acknowledging or explaining the apparent inconsistency.[10] In sum, the Selbys' brief fails to present the objective facts of the case, including appropriate citations to the record that are required to facilitate appellate review.
These problems with the Selbys' brief cannot reasonably be considered mere oversight or innocuous misreading of the record. We can only conclude that the Selbys' counsel filed their brief in flagrant disregard of the Rules of Appellate Procedure. A party's failure to follow the appellate rules can, in egregious situations, lead to dismissal of the appeal. See Sartain v. Blunck, 453 N.E.2d 324, 326 (Ind.Ct.App.1983). This is an egregious situation. However, we are reluctant to punish the litigants for the sins of their attorney, despite the fact that they hired, and were free to fire, him. Because serious issues surround the retrial of this case that have not been resolved, we are reluctant to take any action at this point. However any of these issues shake out, we request the trial court in considering appropriate relief to (a) disallow any attorney fees available to plaintiffs for this appeal as unreasonable and (b) consider whether to award to the Kirchoffs expenses unnecessarily incurred in responding to this appeal as a result of Selbys' disregard of the Rules of Appellate Procedure.
*657 The Court of Appeals complimented the trial court on "the patience of Job" displayed in dealing with the various charges hurled in this proceeding. Kirchoff, 686 N.E.2d at 132-33 n. 14. In our view, the Court of Appeals also bent over backward to accommodate unorthodox, if not wholly unnecessary procedures, including permitting both parties in this case to each file their own record. The Kirchoffs' is thirty-nine and the Selbys' is forty-nine volumes with a supplement. Curiously both parties cite to only one recordthe Kirchoffs'although the Selbys' motion to file a second amended complaint is found only in the Selbys' version. Dueling records are not helpful to an appellate court. The parties are expected to agree on one record with whatever is necessary to support the contentions of all parties. The appellate rules outline the proper procedures if a difference as to the record arises on appeal. Ind. Appellate Rule 7.2(C). In this respect as in the others noted, these appear to have been disregarded.

Conclusion
We affirm the trial court's denial of the Kirchoffs' motion for judgment on the evidence on the securities fraud claim. We summarily affirm the decision of the Court of Appeals with respect to the issues other than those described in Part II of this opinion. Ind. Appellate Rule 11(B)(3). This case is remanded for proceedings consistent with this opinion.
SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.
NOTES
[1] Although Van Eaton identified these transactions as "exchanges" it is apparent that Summit Bank on behalf of the holding company wrote checks to each Bank shareholder for the purchase price of his or her shares. That person then wrote a check to the holding company to purchase holding company shares.
[2] For example, it includes representations as to the Selbys' (the "subscribers") net worth, etc. See generally Regulation D, 17 C.F.R. § 230.501 (1998).
[3] Whether it does so implicitly is a question not raised by any party and as to which we express no opinion.
[4] The Federal District Court for the Northern District of Indiana in Ackerman v. Schwartz, 733 F.Supp. 1231 (N.D.Ind.1989), held that an attorney who wrote a tax opinion letter was not an agent who materially aided in the sale and thus not liable under Indiana's Act. Relying on the Act's definition of agent, the court found that liability under the Act "requires something more than the mere drafting of an opinion letter." Id. at 1252. Liability attaches under the Act "only if [the attorney] effects or attempts to effect the purchase or sale of securities." Id.
[5] As the Supreme Court observed in Central Bank, 511 U.S. at 169, 114 S.Ct. 1439, "the first and leading case" on aider and abettor liability under federal securities laws was the opinion by Judge Eschbach, then of the Northern District of Indiana, in Brennan v. Midwestern United Life Insurance Company, 259 F.Supp. 673 (N.D.Ind. 1966), aff'd 417 F.2d 147 (7th Cir.1969). By the time of the Central Bank decision Brennan had been followed by virtually every federal circuit.
[6] Congressional action after Central Bank has restored the Securities and Exchange Commission's ability to enjoin aiders and abettors and seek civil monetary penalties from them. 15 U.S.C. § 78t(f) (Supp. II 1996). See also United States S.E.C. v. Fehn, 97 F.3d 1276 (9th Cir. 1996).
[7] The standard for "materially aids" under state securities laws has been found by some courts to be different from federal aider and abettor liability. Compare Monsen v. Consolidated Dressed Beef Co., 579 F.2d 793, 799-800 (3d Cir.1978) (Federal aider and abettor liability requires a showing of (1) existence of a securities law violation by the primary party; (2) knowledge of that violation by the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of that violation. Substantial assistance is determined by: (a) the amount of assistance given by the person; (b) the person's presence or absence at the time of the violation; (c) the person's relation to the person committing the violation; and (d) the person's state of mind.), and Saltzman v. Zern, 407 F.Supp. 49, 53 (E.D.Pa.1976) (applying three prong test for federal aider and abettor liability), with Connecticut National Bank v. Giacomi, 242 Conn. 17, 699 A.2d 101, 121-122 (Conn.1997) (Violation of "materially aids" provision requires showing of (1) violation of securities act and (2) material assistance by aider and abettor. Material assistance is aid that has a natural tendency to influence or is capable of influencing the decision of the purchaser.), Foley v. Allard, 427 N.W.2d 647, 651 (Minn.1988) (adopting three-prong federal test for aider and abettor liability but defining substantial assistance in prong three as a substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff), and Mendelsohn v. Capital Underwriters Inc., 490 F.Supp. 1069, 1084 (N.D.Cal.1979) (applying substantial causal connection standard to state aider and abettor violation).
[8] The terms do not appear in the definition of "sale." This lack of reciprocity suggests that an indirect acquisition is covered by the statute but not necessarily an indirect disposition. "Directly or indirectly" as applied to "purchase" may have application in other portions of the statute. For example an investment advisor is one who advises with respect to the "purchase" of securities. As a result, the registration and other provisions applicable to advisers may apply with respect to a holding company structure. However, for the reasons stated, the term does not seem to fit meaningfully in the civil liability provision of § 19(a).
[9] The Selbys' brief states: "[t]he Selbys executed a Promissory note payable to the Kirchoffs in the amount of $244,500 for financing part of the sale of Worthington State Bank stock owned by Ralph and Wilma Kirchoff." The record shows that the promissory note in question states "the purpose of this loan is to purchase 215 share of Worthington Bancshares, Inc."

The Selbys' brief states: "[t]he stock was worthless because Ralph Kirchoff was the Chairman and controlling shareholder of the bank and caused said bank to have a C.A.M.E.L. rating of 4 at the time of the sale." No citation to the record is provided for this proposition. C.A.M.E.L. ratings are a system for identifying a bank's viability on a scale of 1 to 5, with 5 meaning the bank has failed. The record shows that the FDIC gave the Bank a C.A.M.E.L. rating of 2 in September 1988 and the DFI gave the Bank a 1 in March 1987 and a 2 in January 1989. It is possible that one of those agencies gave the Bank a lower rating at another time, however, Selbys focus on the time of the sale which took place in November and December 1988. The three ratings found in the record encompass the time of the sale making it highly improbable that either agency issued a rating of 4 at the relevant time.
[10] The Selbys' brief states: "Ralph Kirchoff as Chairman of the Board of Worthington State Bank, arranged the $250,000 to be paid to the Kirchoffs through a loan by Worthington State Bank." However, the record indicates that Ralph Kirchoff was not chair of the board at the time the loan was approved and that the loan proceeds checks from the bank were made payable to the holding company, not the Kirchoffs.

The Selbys' brief states: "Ralph Kirchoff had Diane and Jeff Selby sign a check for $250,000 and . . . for $244,500 which was put in Ralph Kirchoff's account." The record shows that the check issued by the Kirchoffs on the promissory note was endorsed by the Selbys to Worthington Bancshares Inc. The check was then endorsed for Bancshares by Van Eaton and deposited in Bancshares' account at Summit bank. The Selbys point to no evidence that the check was ever deposited in Ralph Kirchoff's account.