State of INDIANA ex rel. Chris
NAYLOR, Indiana Securities
Commissioner, Plaintiff,

v.

INDIANA STATE TEACHERS ASSOCI-
ATION, ISTA Insurance Trust, ISTA
Financial Services Corporation, ISTA
Welfare Benefits Trust, ISTA Admin-
istrative Services Corporation, and
National Education Association, De-
fendants.

No. 1:09–cv–01506–SEB–DML.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 26, 2013.

Order Denying Reconsideration
April 17, 2013.

Alan S. Brown, Joel E. Tragesser, Michele Lorbieski Anderson, Thomas E. Satrom, Frost Brown Todd LLC, Indianapolis, IN, for Plaintiff.

Abigail V. Carter, Daniel Zibel, Douglas L. Greenfield, Jeremiah A. Collins, John M. West, Robert M. Weinberg, W. Gary Kohlman, Bredhoff & Kaiser P.L.L.C., Washington, DC, Alice Mckenzie Morical, Andrew W. Hull, Kimberly L. Cohen, Hoover Hull LLP, Indianapolis, IN, for Defendants.

1. As discussed *infra,* this entry also disposes of Docket Nos. 192 and 194.

## ORDER ADDRESSING DEFENDANTS' PENDING MOTIONS FOR SUMMARY JUDGMENT

SARAH EVANS BARKER, District Judge.

Presently before the Court are two motions for summary judgment,[1] filed pursuant to Federal Rule of Civil Procedure 56 on April 13, 2012, by Defendants, the Indiana State Teachers Association ("the ISTA") *et al.* [Docket No. 170], and the National Education Association ("the NEA") [Docket No. 174], respectively. Plaintiff opposes both of the pending motions. For the reasons set forth in this entry, the Court finds that genuine issues of disputed material fact remain concerning both motions and, accordingly, DENIES these motions.

### Factual Background

Plaintiff, Chris Naylor ("the Commissioner"), serves the State of Indiana as its duly appointed Securities Commissioner. Am. Compl. ¶ 3. In his official capacity, the Commissioner oversees the Securities Division of Indiana's Office of the Secretary of State. He is tasked with administration and enforcement of the Indiana Uniform Securities Act ("the Act"), Ind.Code § 23–19–1–1 *et seq. Id.* In performing his duties, he has the power to conduct investigations of potential Act violations and bring an action on behalf of the State of Indiana if he believes such a violation has occurred. *Id.*

The ISTA is an Indiana not-for-profit corporation with its principal place of business in Indianapolis, Indiana. Am. Compl. ¶ 4. Four other defendants in this action (collectively, "the ISTA Entities"[2]) are

2. The "ISTA Entities" are the ISTA Insurance Trust, ISTA Financial Services Corporation, the ISTA Welfare Benefits Trust, and ISTA Administrative Services Corporation.

ISTA subsidiaries that maintain their principal places of business in Indianapolis, Indiana and have in common certain "directors, employees, officers, offices, and funds." *Id.* ¶¶ 5–8. One of the ISTA Entities' key functions is to provide insurance products (including long-term disability and health arrangements) to ISTA members, *i.e.,* teachers and other school employees in Indiana. *Id.* ¶ 12. Specifically, the ISTA Trust ("the Trust") was established in 1985 to furnish group medical benefits to forty-one Indiana school districts. ISTA Br. at 3. The school districts joining these arrangements executed Participation Agreements and/or Funding Agreements with the Trust. *See* ISTA Br. Exs. 9, 10. Pursuant to these agreements, each participating school district was responsible for funding:[3] "(i) the premiums[4] on the stop-loss insurance policy; (ii) the Plan's share of administrative and operating expenses of the Trust; (iii) the funding of the Reserve; and (iv) the funding of incurred claims." ISTA Br. Ex. 10 at 3. Plans designed by the Trust included, *inter alia,* the "Health*e* Perks Program," a prescription drug card and mail order program, and a disease management program. ISTA Br. at 4.

Another feature of the Trust's health insurance plan was a claims stabilization reserve ("the CSR Program").[5] Am. Compl. ¶ 14. Under the CSR Program, a Trust participant "would be credited with a CSR balance if the total amount of payments by the school district to ISTA exceeded the amount of claims paid, plus administrative expenses and other overhead amounts assessed by ISTA." *Id.* ¶ 15. Many Funding Agreements—notably, those for school districts participating in the Guaranteed Group Advantage ("the GGA")—described the CSR Program as a way the Trust could grow its reserves[6] "as a result of more favorable than anticipated claims experience." ISTA Br. at 6. School districts participating in the GGA knew that their CSR would exclusively benefit participants in their respective plans. By contrast, school districts taking part in the Small Group Pool ("SGP") and PRIDE programs understood that CSR accumulated for *all* participants in those specified plans. *Id.* at 7. Plaintiffs allege that Defendants told the school districts that, to the extent possible, they "would receive a return on their CSR balances." Am. Compl. ¶ 16. Part of the method for calculating this return involved determining the return earned by ISTA and the Trust on their investments. In some instances, school districts were promised guaranteed rates of return. *Id.* ¶ 17.

Although school districts did not typically withdraw CSR contents, these funds could be used to offset a portion of premium responsibilities for a given month (a "premium holiday") or year. ISTA Br. at 7–8; *see also* Sullivan Dep. at 200–03. Local teachers' associations often had some input as to whether the school districts within their purview could use CSR for a

---

**3.** Participating school districts' obligations were typically established via collective bargaining with local teachers' associations. ISTA Br. at 5.

**4.** The Commissioner argues that one disputed issue of material fact is whether school districts paid "premiums." Because Indiana law defines the term "premium" as "money or any other thing of value paid or given in consideration to an insurer, insurance producer, or solicitor on account of or in connec-

tion with a contract of insurance," we disagree. Ind.Code § 27–1–2–3(w).

**5.** Plaintiffs also refer to the CSR Program as a "rate stabilization reserve" and a "collaborative surplus reserve." Am. Compl. ¶ 14.

**6.** Reserves were divided into two categories: incurred but not yet reported ("IBNR Claims Reserves") and CSR, which constituted any reserves in excess of IBNR Claims Reserves. ISTA Br. at 6–7.

"premium holiday" or as a pledge against the full year's premium. ISTA Br. at 8. A particular school district's entitlement to retain accumulated CSR upon the district's termination of participation in the Trust depended on whether that district was part of the GGA, SGP, or PRIDE program. Many GGA districts "could use accumulated CSR to purchase continuing benefits for participating employees through another provider," whereas SGP and PRIDE districts' "accumulated CSR remained with the Trust." *Id.* at 8–9. However, to the extent that any specific school district's teachers contributed money to cover premium costs, some portion of that district's CSR balance included money paid by teachers. *Id.* at 8.

Interest was applied to CSR balances at varying rates during the relevant time period of this lawsuit. ISTA Br. at 9–10. It is not entirely clear how the Trustees established interest rates each year, but the parties have cited several methods: establishing a "conservative enough" number; going over "the financial situation" via consultants; looking at the five- to ten-year Treasury rate; and even assessing previously employed bond measurements. Rogers Dep. at 133–35; Wise Dep. at 40–41; ISTA Br. Exs. 36–38. Between 1998 and 2007, the interest rates applied to CSR balances ranged from a low of 3% to a high of 6.5%. ISTA Br. at 10. Thus, when a school district was deciding whether to renew its participation in the Trust's health care program for another year, the Trust would provide a detailed report of the plan's financial history. These reports, which sometimes included accumulated interest dollars, typically focused on details like PPO savings, hospitalization charges, and expenses categorized by medical diagnosis. *Id.* at 13. Such data was presumably useful to school districts "consider[ing] an array of factors" in their efforts to differentiate the Trust from other group health providers. *See id.* at 12. The ISTA asserts that "school districts did not give controlling weight—or[,] indeed, any significant weight at all—to the interest rate the Trust might apply to CSR balances." [7] *Id.* at 14.

Although the foregoing facts (and, of course, the name "ISTA *Insurance* Trust") establish that the Trust furnished group health insurance coverage, the Trust has never been registered with the Indiana Department of Insurance ("the IDOI") as an insurance company. ISTA Br. at 18; Pl.'s Resp. at 9. The IDOI "held off ... asserting jurisdiction" over the Trust for approximately twenty years. ISTA Br. Ex. 75 (email from Carol Mihalik of IDOI to Chuck Rolph of ISTA). But in 2005, based on its evolving understanding of the Trust's structure, the IDOI began expressing its view that the Trust met the statutory definition of a Multiple Employer Welfare Arrangement ("MEWA"). [8] ISTA Br. at 16–17. Between 2005 and 2009, the Trust and the IDOI maintained a regular correspondence regarding the Trust's continuing operations and, specifically, whether the Trust should be required to register as a MEWA. *Id.* at 17. The Trust eventually acquiesced by submitting a MEWA registration application, which the IDOI

---

**7.** The Commissioner vehemently disputes this allegation and rejoins that the CSR Program "allowed [school districts] to determine how much they could plan on making on CSR each year." Pl.'s Resp. at 8. Moreover, the Commissioner asserts, school districts "believed that CSR money was theirs to use[,] relied on the CSR money ... and were emphatic about using it." *Id.*

**8.** A MEWA is "an entity other than a duly admitted insurer that establishes an employee benefit plan for the purpose of offering or providing accident and sickness or death benefits to the employees of at least two (2) employers, including self-employed individuals and their dependents." Ind.Code § 27–1–34–1(b).

received on May 4, 2009. *Id.* Ex. 4. Four days later, the IDOI issued an order responding to the Trust's application as follows:

> The Enforcement Division of the [IDOI] will decline to act with regard to ISTA's MEWA registration ... through July 1, 2009, in order to allow the transition to fully insured status with UHC to be fully implemented. The ISTA is ordered to place $4.7 million, within five business days from the date of the order, into a trust or joint custodial account so as to secure the cash necessary to facilitate the transition, pursuant to a form of trust or custodial agreement acceptable to the [IDOI].

*Id.* at 4. This decision appears to have resulted in part from the IDOI's questions as to the Trust's solvency. Relying on advice from a consulting firm, the IDOI expressed concern regarding "the inability of the [Trust's] current assets to adequately fund the liabilities" and reported that, "[i]n the event of insolvency[,] there is no state guarantee fund for the ISTA, either as a registered MEWA or in its current unregistered status." *Id.* at 3.

According to the Commissioner, the ISTA failed to disclose numerous material facts to each of the CSR Program participants during the foregoing time period (which involved numerous offers and reports to school districts). Am. Compl. ¶ 20. The Commissioner alleges, *inter alia*, that the ISTA Entities withheld adverse information regarding the stability of the health arrangement and represented that it was financially sound when it was not. *Id.* ¶¶ 18–19. Importantly, the Commissioner asserts, CSR Program participants were not informed that the health arrangement constituted an unregistered

security or that the ISTA Entities' speculative investment practices had left the Trust without sufficient assets to meet its obligations. *Id.* ¶¶ 18, 21.

In light of the foregoing, operational control of the ISTA Entities and their assets is currently entrusted to the "ISTA's sanctioning or parent organization"—the NEA.[9] Am. Compl. ¶ 23. This supervisory change took place on May 20, 2009 as a direct result of the ISTA Entities' financial difficulties. On that day, the NEA officially assumed ISTA's day-to-day operations and appointed Edward Sullivan as the sole trustee and acting Chief Executive Officer of the Trust. *Id.* ¶ 10. Mr. Sullivan's understanding of the takeover was that the ISTA Entities "were behind and ... had concerns about how they were managing [the] ISTA's finances." Sullivan Dep. at 19. When questioned about his perception of the trusteeship, he answered, "Essentially ... I'd be responsible overall for the organization." *Id.* at 19–20. Mr. Sullivan also indicated that he was responsible for problem solving, overseeing the Trust's transition to a private plan, and seeing that certain contracts were properly administered—one of which was a loan agreement between the NEA (lender) and ISTA (lendee). *Id.* at 24–28, 30. These efforts demanded approximately fourteen hours per day of his time until March 2010. *Id.* at 27.

Another facet of the ISTA–NEA relationship is a body of documents known as the "UniServ Agreements." The parties entered into these agreements to establish the Unified Staff Service Program ("the UniServ Program"), which "provide[s] members and local associations with professional staff and necessary support ... services to enable local associations to im-

---

9. The NEA, a national organization with its principal place of business in Washington, D.C., represents public school teachers and other school support personnel across the country. Am. Compl. ¶ 10. Each year, the ISTA collects dues from its members for the benefit of the NEA. Pl.'s NEA Resp. at 2.

plement, improve, and coordinate" programs for Indiana education professionals. NEA Br. at 3; 2008 UniServ Agrmt. at 2. The most recent UniServ Agreement tasked the ISTA Executive Director with administering Indiana's UniServ Program, which included four UniServ staff members ("the UniServ Directors") hired pursuant to a collective bargaining agreement. However, the ISTA Executive Director could also delegate "programmatic and supervisory authority for the direction of" the UniServ Directors. 2008 UniServ Agrmt. at 2.

For the 2008–09 fiscal year, NEA agreed to contribute $1,238,400 to fund Indiana's UniServ Program. 2008 UniServ Agrmt. at 3. The NEA provided the ISTA more than $1 million per year to compensate the UniServ Directors and also contributed to "the costs related to UniServ staff career development activities." Pl.'s NEA Resp. at 11; Sullivan Dep. at 59 ("[The NEA] provide[s] it to the association, not to the UniServ [D]irector."); 2008 UniServ Agrmt. at 4–5. In return for this financial assistance, the NEA reserved several rights:

- to "use each UniServ [Director] for up to 10 working days each year," 2008 UniServ Agrmt. at 4;

- to be consulted "regarding the nature and content of UniServ staff career development activities for which NEA UniServ funding assistance will be requested," *id.* at 4–5;

- to "make the final decision in regard to those activities toward which NEA

will provide financial support," *id.* at 5;

- to "conduct a review of the total statewide UniServ Program at least once every six years," *id.;* and

- to receive, "[u]pon reasonable request, ... information [from the UniServ Directors] ... when requested by NEA."

*Id.* at 7. The Commissioner has acknowledged that, during the relevant timeframe of this lawsuit, the parties considered the UniServ Directors to be "agents of the ISTA Entities." Am. Compl. ¶ 10.

On December 2, 2009, the Commissioner filed suit against all Defendants in the Marion Circuit Court. The ISTA Entities removed the matter to federal court on December 9, 2009, commencing the instant litigation. In his Amended Complaint [Docket No. 138], filed December 17, 2010, the Commissioner submitted four causes of action arising out of Defendants' alleged wrongdoing in mismanagement of the Trust: (1) Count One, alleging that the ISTA Entities sold a security without first registering it with the Indiana Securities Division, in violation of Indiana Code § 23–19–3–1(3); (2) Count Two, alleging that the ISTA Entities transacted business as an "investment adviser representative" without first registering themselves under the Act as such, in violation of Indiana Code § 23–19–4–4(a); (3) Count Three, alleging that Defendants knowingly supervised unregistered investment adviser representative activity, in violation of Indiana Code § 23–19–6–3; [10] and (4) Count Four,

---

**10.** The Amended Complaint actually cites Indiana Code § 23–19–1–2(16) as the violated statute, which is incorrect. The provision of the Act cited in the Amended Complaint defines the term "investment adviser representative" as "an individual employed by or associated with an investment adviser or federal covered investment adviser and who makes any recommendations or otherwise gives investment advice regarding securities,

manages accounts or portfolios of clients, determines which recommendation or advice regarding securities should be given, provides investment advice or holds herself or himself out as providing investment advice, receives compensation to solicit, offer, or negotiate for the sale of or for selling investment advice, or supervises employees who perform any of the foregoing."

alleging that Defendants made fraudulent misrepresentations in connection with the offer, sale, or purchase of a security, in violation of Indiana Code § 23–19–5–1. We denied Defendants' Motion to Dismiss on April 28, 2010, and the matter is now before us on summary judgment.[11]

### Legal Analysis

## I. Standard of Review

Summary judgment is appropriate where the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255, 106 S.Ct. 2505. However, neither the "mere existence of some alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir.2000).

Summary judgment is neither a substitute for a trial on the merits nor a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable factfinder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chi. Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). Moreover, if it becomes clear that a plaintiff will be unable to satisfy the *prima facie* elements of his case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir.2003). Failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

The party seeking summary judgment on a claim for which the non-movant bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-movant's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. A plaintiff's self-serving statements, *i.e.,* those which are speculative or lack a foundation of personal knowledge, and which are unsupported by specific, concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir.1999); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir.1993).

---

11. The briefing materials are less than clear with respect to the Commissioner's theories of liability. However, at this juncture, we understand the Commissioner to be seeking judgment as a matter of law (1) directly on all four counts with respect to the ISTA Entities, and (2) derivatively on all four counts with respect to the NEA (*i.e.,* holding the NEA accountable for acts of the UniServ Directors).

## II. Discussion

### A. ISTA's Liability: Existence of a Security

Throughout this lawsuit, the ISTA Entities have maintained that the Commissioner's claims are not cognizable because the CSR Program is not a "security" as defined and regulated by relevant statutes. Because Defendants have advanced the same contention in support of their motions for summary judgment (and because this is the threshold issue underlying all counts in the Complaint), we shall address at the outset whether any "security" actually exists under these circumstances.

### 1. Proffered Testimony of J. William Hicks

The Commissioner has identified J. William Hicks, attorney and professor at the Indiana University Maurer School of Law, as an expert upon whose report he relies in his response brief (and, presumably, as an expert witness he intends to call at trial). According to the Commissioner, Prof. Hicks's opinion corroborates the Commissioner's argument that the Trust constitutes an investment contract under both federal and Indiana law. Pl.'s Resp. at 20. Defendants respond by filing a Motion in Limine [Docket No. 194] in which they assert that Prof. Hicks's testimony must be excluded from consideration for two reasons: (1) it amounts to inadmissible legal argument, and (2) it lacks the indicia of reliability required by Federal Rule of Evidence 702. In particular, Defendants characterize Prof. Hicks's testimony as deficient because it fails to tie facts to conclusions, omits numerous material facts, and misstates other relevant information. Defs.' Mot. in Lim. at 2.

Although the Commissioner appears to proffer Prof. Hicks as an expert witness on both legal and factual issues, we believe the former capacity is the only appropriate one here. The Commissioner's argument that Prof. Hicks's testimony involves "factual matter[s]," which assertion is limited to a single page (page 8) of his response brief, is entirely too ephemeral. We are persuaded that Prof. Hicks's opinion is not factual in nature; it is a legal opinion about an "ultimate" issue in controversy. Thus, we will address next whether the Commissioner has established that Prof. Hicks's testimony is admissible regarding the sole issue of whether the Trust's CSR Program is a "security."

■ Expert testimony, of course, is often appropriate and beneficial in resolving disputes before the Court. As we have previously noted, "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue [is] satisfied." *Blickenstaff v. R.R. Donnelley & Sons Co. Short–Term Disability Plan*, No. IP 00–C–983–B/S, 2002 WL 169320, at *4 (S.D.Ind. Jan. 28, 2002) (quoting *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212–13 (D.C.Cir.1997)). Nevertheless, in the same ruling, we cautioned that an expert may *not* testify as to whether the legal standard itself has been satisfied. *Id.* We find especially instructive Chief Judge Easterbrook's admonition that, if an expert intends to testify about the meaning of a statute, "[t]hat's a subject for the court, not for testimonial experts ... [because t]he only legal expert in a federal courtroom is the judge." *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir.2008) (citing *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994)). This is not to say that judges cannot benefit from specialized knowledge, but rather that such knowledge belongs in attorneys' briefs. *See RLJCS Enters., Inc. v. Prof'l Ben. Trust Multiple Emp'r Welfare Ben. Plan & Trust*, 487 F.3d 494, 498 (7th Cir.2007) (suggesting that "the

holders of that [specialized] knowledge can help counsel write the briefs").

When faced with a similar situation in *United States v. Cross,* 113 F.Supp.2d 1282 (S.D.Ind.2000), our former colleague, Judge Tinder, set forth an excellent recitation of authority to support his exclusion of expert witness testimony. *Cross* involved the proffer of testimony regarding the definition of "illegal gambling devices" under Indiana state law. *Cross,* 113 F.Supp.2d at 1283. Judge Tinder sagely noted that Federal Rule of Evidence 704 does not preclude experts from testifying as to "ultimate issue[s]." *Id.* at 1284–85 (citing Fed. Evid. R. 704). However, he was careful to warn the parties that, pursuant to the advisory committee notes on that rule, "[t]he abolition of the ultimate issue rule does not lower the bar[ ] so as to admit all opinions." *Id. Cross's* import is that Rule 704 is merely one facet of a procedural scheme—including Rules 701, 702, and 403—that requires opinion testimony to be helpful to the trier of fact without wasting time. Our rules are aimed at avoiding the undesirable result of admitting testimony that instructs the factfinder as to the proper result in a particular case. *See id.* (citing advisory committee note to Fed. Evid. R. 704).

■ Here, as in *Cross,* we conclude that the proffered testimony would encroach upon the Court's role in deciding whether the Trust qualifies as a "security" under Indiana law. Prof. Hicks's brief explanation of his role as an expert makes clear his intent to advise the Court in a matter of statutory interpretation. His opinions, if admitted, would not only duplicate legal arguments ably dealt with in counsel's analysis, but would also improperly suggest that federal courts could turn to him for legal guidance. *Accord. Roundy's Inc. v. N.L.R.B.,* 674 F.3d 638, 648 (7th Cir. 2012). We therefore shall follow Judge Tinder's lead in holding that a lawyer may not testify as an expert on purely legal matters. Our decision should not be surprising, given the Seventh Circuit's position that judges, as "experts on law," have especially strong interpretational and translational skills. *E.g., Sunstar, Inc. v. Alberto–Culver Co.,* 586 F.3d 487, 496 (7th Cir.2009). Because this case does not present circumstances in which "relying on paid witnesses to spoon feed judges" is defensible, *see Sunstar, Inc.,* 586 F.3d at 496, Prof. Hicks may not offer an expert opinion that the Trust is a "security" as defined by Indiana law. Accordingly, Defendants' Motion in Limine is GRANTED, and Prof. Hicks's testimony will not be considered for purposes of resolving the instant motions.

### 2. Application of Indiana law

Indiana's statutory classification of a "security" is extensive, and, as our colleague Judge McKinney has observed, "the Indiana definition of 'security' is somewhat broader than the federal definition." *Columbia Hous. Partners SLP Corp. v. Camby Hous. Partners LLC,* No. IP 01–00689–CM/S, 2002 WL 1760742, at *9 n. 2 (S.D.Ind. July 29, 2002) (citing *B & T Distribs., Inc. v. Riehle,* 266 Ind. 646, 366 N.E.2d 178 (1977)). Under the Act, the term "security" contemplates a "certificate of interest or participation in a profit-sharing agreement," an "investment contract," or the "right to subscribe to or purchase" the foregoing items. Ind.Code § 23–19–1–2(28). The Act characterizes an "investment contract" as "an investment in a common enterprise with the expectation of profits to be derived primarily from the efforts of a person other than the investor" and "an investment in a viatical settlement or similar agreement." *Id.* § 23–19–1–2(28)(D)-(E).

■ Indiana courts utilizing these statutory definitions have borrowed from

federal jurisprudence—for example, from *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), which provides that an investment contract exists when "a person (1) invests money (2) in a common enterprise (3) premised upon a reasonable expectation of profits (4) to be derived from the entrepreneurial or managerial efforts of others." *Poyser v. Flora*, 780 N.E.2d 1191, 1195 (Ind.Ct.App.2003) (citing *Howey*, 328 U.S. at 301, 66 S.Ct. 1100); *see also Manns v. Skolnik*, 666 N.E.2d 1236, 1243 (Ind.Ct.App.1996) (noting that Indiana courts apply the *Howey* test when determining whether a transaction is an "investment contract"). Alternatively, though Indiana courts have not expressly adopted it, the Indiana Secretary of State has endorsed via policy statement the "risk capital test." This test defines an investment contract as "[a]ny investment of money . . . in the risk capital of a venture with the expectation of some benefit to the investor where the investor has no direct control over the investment . . . of the venture." *State of Ind. ex rel. Naylor v. Ind. State Teachers Ass'n*, No. 1:09–cv–1506–SEB–TAB, 2010 WL 1737914, at *3 (S.D.Ind. Apr. 28, 2010). Another colleague of the Court, Judge Pratt, recently noted that "both tests require the instrument at issue to be an *investment*, which occurs when an entity parts with its money or another form of bargained-for consideration 'in the hope of receiving profits [or some benefit] from the efforts of others.'" *Valley Forge Renaissance, L.P. v. Greystone Serv. Corp.*, No. 1:09–cv–00131–TWP–MJD, 2012 WL 1340802, at *13 (S.D.Ind. Apr. 18, 2012) (quoting *United Hous. Found. v. Forman*, 421 U.S. 837, 858, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)).

▪ According to the ISTA, discovery has revealed that the CSR Program is "nothing more than an interest-bearing excess premium balance to be applied to future premium costs" and, therefore, not a security. ISTA Br. at 19. The ISTA's chief argument is that "the underlying transaction is the purchase of a product, and the alleged 'investment return' is simply a component of the pricing of the product." *Id.* at 2. In fact, the ISTA contends, there is no "return" unless one defines "return" as having paid for more product than one has consumed. Thus, in its opening brief in support of summary judgment, the ISTA asserts that "[t]here is a fundamental distinction in securities law between investing money for the purpose of making a profit . . . and purchasing a commodity or service[ ]." *Id.* at 1 (citing *Forman*, 421 U.S. at 837, 95 S.Ct. 2051). Placing great weight on two federal cases interpreting *Howey*, the ISTA contends that "other commercial or consumer purposes" disqualify this investment as a security. *Id.* at 21–23, 66 S.Ct. 1100; *Forman*, 421 U.S. at 852–53, 95 S.Ct. 2051 ("[W]hen a purchaser is motivated by a desire to use or consume the item purchased—'to occupy the land or to develop it themselves,' as the *Howey* Court put it—the securities laws do not apply."); *Waldo v. Cent. Ind. Lutheran Ret. Home*, No. IP–79–514–C, 1979 WL 1279, at *3 (S.D.Ind. Nov. 16, 1979) (finding a transaction not "within the scope of the securities laws" when "the interest provision is only an incidental and insubstantial part of what is essentially an agreement to procure a personal residence with health care facilities"). We are not so persuaded, however, that this "distinction" or these case citations provide a clear-cut basis for summary judgment in the ISTA's favor. The determination of whether any transaction involves a "security" is highly fact-sensitive. Justice Powell instructed as much in *Forman* when he noted, "We decide *only that the type of transaction before us*, in which the purchasers were interested in acquiring housing . . . , is not within the scope" of the relevant securities laws. *Forman*, 421 U.S. at 860, 95 S.Ct. 2051 (emphasis added).

As the ISTA describes the transactions at issue, "school districts paid premiums to the Trust to acquire health insurance for their employees, not to invest for profit." ISTA Br. at 30. The ISTA asserts that *Howey, Forman,* and *Waldo* preclude the Court from a finding that any "investment"—much less an investment contract and, by extension, a security—existed in this case. Bearing in mind that Indiana paints with a wider brush in defining the term "security," we must examine this terminology in conjunction with the operative facts. *See generally Riehle,* 266 Ind. 646, 366 N.E.2d 178. *Black's Law Dictionary* defines the term "investment" as "[a]n expenditure to acquire property or assets," and the Indiana Supreme Court has expressly deemed health insurance policies "assets." *Bingley v. Bingley,* 935 N.E.2d 152, 156 (Ind.2010). Moreover, the Act contemplates in its definition of "investment adviser" one who provides advice concerning "financially related services" and even specifies situations where a trust or other entity "of institutional character" may be deemed an "institutional investor." *See* Ind.Code § 23–19–1–2(15); *id.* § 23–19–1–2(11)(H), (O). The portion of the Indiana Code addressing public health benefit plans likewise directs that "[a]ll assets in a trust fund established under this subsection ... are dedicated exclusively to providing *benefits* to covered individuals and their beneficiaries according to the terms of the health plan." *Id.* § 5–10–8–6(d)(1) (emphasis added). And, relatedly, *Black's Law Dictionary* defines the term "benefit" as an "advantage, privilege, profit or gain." This foregoing linguistic detour makes clear that the existence of "security," at least under Indiana law, does not turn on labels and simplistic arguments.

Ultimately, the most troubling aspect of the ISTA's chief argument (to wit, that the Trust arrangement was in no way an "investment") is the incorrect characteriza-tion of the facts upon which it relies. Our review of the record indicates that a number of facts—many of them material—cannot properly be considered "undisputed." The fact that this case involves group health plans for a number of school districts hinders our ability to reach broad conclusions as to expectations of profit or benefit. Several evidentiary items actually sharply undercut the ISTA's argument that the school districts did not anticipate some sort of economic benefit to result from their participation in the Trust. To that end, the following statements strongly suggest that there *is* a genuine issue of material fact regarding whether the school districts (either individually or in the aggregate) "invested" in the Trust:

- Matthew Ruess of Crown Point Community Schools opined, "I have always felt that the premiums were set at an exceeding rate to generate higher CSR balances so that ... during the course of investing that money ... that money was being used and directed back to the ISTA." Pl.'s Resp. Ex. R at 121.

- Douglas Rose of Vincennes School Corporation noted, "[T]he pledge was always a big asset ... because we were always having to try to reduce ... costs for the employee.... The CSR was a big factor in how we bargained, how much money we had." *Id.* Ex. L at 51–52.

- Paul Gabriel of Center Grove Community School Corporation stated, "[A]t the bargaining table, the teachers would say, oh, we don't want to *use that CSR* because the implication would be we would rather pay more.... So if you're able to use the money, that was this very informal process that I talked about of knowing that there was some review going on by the Trust and ... that [the Trust field coordinator] would kind of have to talk with someone at the

Trust to determine if this would be appropriate." *Id.* Ex. P at 101 (emphasis added).

- Anthony Nonte of Shoals Community School Corporation expressed that the CSR Program's ability to "keep within bounds the otherwise growing cost of medical insurance" was "seen as a positive feature" justifying his district's selection of the Trust over other options. *Id.* Ex. M at 51–52.

- Trust Field Coordinator Deb Wolfe testified, "[B]ecause the [Trust] was not subject to the same investment restrictions as public school corporations, and because we guaranteed the quoted interest rate, *a school district could receive a better return on its money* if it allowed the [Trust] to hold and invest the IBNR [and] CSR funds. Field coordinators were also told that the school districts would have greater flexibility in using the CSR funds and in receiving those funds upon termination than they would have in insurance company plans or similar trust arrangements. Field [c]oordinators were also instructed that we should advise the districts that as to the CSR funds, "[t]hese are your dollars and you control how they are used." *Id.* Ex. O at 2 (emphasis added).

- Ms. Wolfe further asserted that "[a]pproximately 90–95% of school districts" knew they had "positive CSR balances." *Id.* at 6.

- Bruce Rogers, director of collective bargaining for the ISTA, asserted, "I

would consult with [our investment advisor] as to what we thought was going to transpire over the next 12 months, and we'd make a guess as to what a safe return would be. So if ·we thought we were going to do seven or eight [percent] over the next 12 months, I'd guarantee them a five percent return to give us a margin of error. And it involved some risk, but that's how we did it. And it gave schools a comfort level because *they knew up front what they were going to get on their money.*" *Id.* Ex. H at 222 (emphasis added).

Faced with similarly contentious disputes, courts applying Indiana law often recognize the senselessness of strictly construing the term "security." *E.g., Sheets v. Dziabis,* 738 F.Supp. 307, 311 (N.D.Ind. 1990) (opportunity to purchase ownership interest in stallion and place breeding rights with limited partnerships for an assured price was a security, even though owner realized no profit); *Szpunar v. State,* 783 N.E.2d 1213, 1220 (Ind.Ct.App. 2003) (jury properly concluded that "investments in the purchase of and the leasing of public pay telephone equipment units [were] securities"). Judge McKinney's guidance in *Columbia Housing Partners* is particularly germane here. In that case, he emphasized that "the Indiana Securities Act itself mandates that its provisions be 'liberally construed.'" *Columbia Hous. Partners,* 2002 WL 1760742, at *8. He subsequently underscored the Indiana Secretary of State's longstanding position [12] (vis-à-vis the Securities Division)

---

**12.** Both Judge McKinney and the Commissioner have addressed the Secretary of State's interpretation of the Act as expressed in an interpretive opinion from 1993. This document, entitled "Statement of Policy on Investment Contracts," implicitly recognizes the breadth of the Act and discusses various tests and factors courts employ to define the term

"investment contract." According to the ISTA, we owe this policy statement no deference because it lacks any "notoriety and significance" which might "shed[ ] light on legislative silence." Defs.' Reply at 5 (quoting *St. Mary's Med. Ctr. v. State Bd. of Tax Comm'rs,* 571 N.E.2d 1247, 1250 (Ind.1991)). We disagree. The Indiana Supreme Court

that this agency "interprets the term 'investment contract' broadly[, which] is consistent with the 'canon of legislative construction that remedial legislation is to be interpreted broadly.'" *Id.* (citing *SEC v. Glenn W. Turner Enters.*, 474 F.2d 476, 480 (9th Cir.1973)). Moreover, he asserted, "the definition of security should be flexible so that it can be 'adapted to ... countless and variable schemes.'" *Id.* (quoting *Howey*, 328 U.S. at 299, 66 S.Ct. 1100). We commend this approach; indeed, we think our ever-changing economy demands no less of a court than to apply realistic, flexible jurisprudence when called upon to do so by the law it is interpreting and applying.

Bearing in mind that these decisions "depend[ ] on the transaction[s'] economic realities in light of legislative intent," judgment as a matter of law for the ISTA seems at best premature. *Sheets*, 738 F.Supp. at 311 (citing *Forman*, 421 U.S. at 848–49, 95 S.Ct. 2051). Legislative intent appears far more certain at this point than the facts underlying the "economic reality" of the Trust agreement. Accordingly, a more extensive fleshing out of the material facts at issue in this case is warranted. We refrain from delving further into the *Howey* or "risk capital" tests at this time not only for these reasons, but also because the ISTA has chosen to focus its summary judgment arguments on the first

and third prongs of the *Howey* test. Having failed to demonstrate that no genuine issue of material fact is in dispute regarding these prongs, we shall refrain from marching through the remainder of the test unless and until the parties submit further evidence for the factfinder to resolve at trial.

## B. NEA's Supervisory Liability

### 1. Contested Exhibits [13]

Before addressing the NEA's core legal arguments, we must address an evidentiary issue raised in the NEA's reply brief. Accompanying this brief are thirteen evidentiary items referenced for the first time at this belated stage of the lawsuit. The Commissioner has filed a surreply brief in response to the NEA's newly disclosed evidence, arguing that "Exhibits 1, 5, 7, 8[,] and 9 are pure, unexceptional hearsay ... [and] should be stricken by the Court." [14] Pl.'s Surreply at 3.

Well-settled Seventh Circuit law holds that new evidence submitted in support of a reply brief should not be considered at summary judgment unless the non-movant has an opportunity to respond. *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir.1997); *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir.1990). This precept also appears in the Local Rules for the Southern District of Indiana, which state that "[a] party

---

has expressly held that "a long adhered to administrative interpretation dating from the legislative enactment, with no subsequent change having been made in the statute involved, raises a presumption of legislative acquiescence which is strongly persuasive upon the courts." *Citizens Action Coal. of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 485 N.E.2d 610, 615 (1985). Here, the disputed statute was revised numerous times after agency interpretation and even recodified fifteen years later—and, as the Commissioner correctly asserts, "[o]n none of these occasions did the legislature make any attempt to address the interpretation of 'investment contract' con-

tained in the 1993 [p]olicy [s]tatement." Pl.'s Resp. at 27. These facts, in our view, suffice to raise the presumption of legislative acquiescence. Therefore, although we are not bound by this policy statement, we see no reason not to consider it in our analysis.

**13.** This subsection disposes of Docket No. 192.

**14.** In the event that the Court deems these exhibits inadmissible, the Commissioner requests that pages 9–11 of NEA's reply brief be stricken as well, given their reliance on the disputed exhibits. Pl.'s Surreply at 3.

opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response. The surreply . . . must be limited to the new evidence and objections." S.D. Ind. Local R. 56–1(d). Because the Commissioner's Surreply addresses only the disputed exhibits, we accept his brief and the responsive arguments contained therein. Accordingly, we conclude that the Commissioner has received a fair opportunity to respond as required by the Seventh Circuit and our local rules.

■ As Federal Rule of Civil Procedure 56 permits him to do, the Commissioner objects to Exhibits 1, 5, 7, 8, and 9 because he believes they would not be admissible at trial. *See* Fed.R.Civ.P. 56(c)(2); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir.2003) (noting that evidence relied upon at summary judgment "must be competent evidence of a type otherwise admissible at trial"). To that end, we now examine each disputed exhibit to determine whether it would pass muster at trial. Exhibit 1 is an online newspaper article [15] entitled "Insurance Chief Blasts ISTA for Benefit Halt." Published in the *IBJ Daily* on June 3, 2009, the article reports that "[the Indiana Insurance Commissioner] said the honorable thing for the [NEA] and . . . the [ISTA] to do would be to continue paying benefits while they seek to recover money from parties at fault in the [T]rust's collapse." Ex. 1 at 1. The NEA characterizes this statement as an admission by the State of Indiana, and we concur. Pursuant to Federal Rule of Evidence 801(d)(2), this statement is statutorily *not* hearsay because: it is offered against an opposing party (the State of

Indiana); it was made by the Indiana Insurance Commissioner in a representative capacity; and the opposing party manifested adoption of its truth. Fed. Evid. R. 801(d)(2)(A)-(B). It is an admission against interest because it casts doubt on certain statements made by the State of Indiana (through the Commissioner) in Plaintiff's Response—namely, that the NEA's decision "to ratify and continue the Trust's decision to pay all LTD claims" was fraudulent. Pl.'s Resp. at 14–15. Exhibit 1 would therefore be admissible at trial and shall not be stricken from the record.

■ Exhibit 5, according to the NEA, is "a compilation of resolutions adopted by the [Trust] and ISTA." NEA Opp. at 3. The first page of this exhibit deems the contents "[R]edacted 2008–2009 ISTA BOARD OF DIRECTORS (Conference Call) MINUTES June 2, 2009." Ex. 5 at 1. The NEA claims to offer this exhibit not for the truth of its contents, but as evidence of verbal acts. We note that a statement that constitutes a verbal act is not hearsay if "the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." *Schindler v. Seiler*, 474 F.3d 1008, 1010–11 (7th Cir.2007) (quoting Advisory Committee Notes to Fed. Evid. R. 801(c)). Here, because the NEA has offered this exhibit to establish the Trust's contractual requirements concerning trustee numbers, we conclude that this exhibit carries independent legal significance. *See* NEA Reply at 3 n. 1. As such, Exhibit 5 is not hearsay and is admissible for purposes of the instant motion.

■ Exhibits 7 and 8 are email communications among counsel for the ISTA

---

**15.** To the extent that Plaintiff's Surreply suggests that Exhibit 1 was not properly authenticated, we disagree. "Printed material purporting to be a newspaper" is self-authenticating and requires no extrinsic evidence of authenticity to be admitted. Fed. Evid. R. 902(6); *Price v. Rochford*, 947 F.2d 829, 833 (7th Cir.1991).

Entities, the IDOI Commissioner, Ed Sullivan, Carol Mihalik, and two other individuals. According to the NEA, these documents are admissible for several reasons: "as evidence of what the email stated to the Commissioner;" as illustrative "of what the Defendants reasonably understood to be the [Commissioner's] position;" and as admissions of a party opponent. NEA Opp. at 3. Having reviewed the emails and the manner in which the NEA relies upon their contents in its reply brief, we reach a different conclusion. The NEA appears to cite these emails as supporting evidence for the Trust's alleged financial insolvency and the scope of the NEA's alleged control over the Trust. Thus, we consider these exhibits to have been offered for the truth of the matter(s) asserted, and we will strike them from the record as inadmissible hearsay.

 Finally, Exhibit 9 consists of two newspaper articles from *The Indianapolis Star* and the Associated Press (both obtained via LexisNexis). The NEA relies on these articles once in its reply brief as follows: "ISTA held a press conference, covered by the Associated Press and widely reported in the Indianapolis media, in which it was announced that, with NEA's assistance in the form of loans, ISTA would use its own money to enable the current . . . beneficiaries to continue to receive their benefits." NEA Reply at 10. Of course, if intended to prove the truth of the articles' contents, this evidence would constitute inadmissible hearsay that cannot create a genuine factual dispute. We think, however, that these articles present no hearsay problem. The NEA has not offered them to prove that NEA and/or the ISTA actually *used* its money to compensate LTD beneficiaries, but rather to prove that they were *reported* to have made statements addressing their finances. Newspaper articles may be admitted into evidence to show that certain information has been publicized. *E.g.,*

*Price,* 947 F.2d at 833; *Gorski v. Bd. of Trs. of Comty. Coll. Dist. No. 504,* No. 93–C–3918, 1994 WL 395836, at *3 (N.D.Ill. July 25, 1994). For this reason, Exhibit 9 may be considered at summary judgment.

### 2. Duty to Supervise

In his Amended Complaint, the Commissioner explains his decision naming the NEA as a defendant "because of its operational control of the ISTA Entities" and "because [the NEA] paid, directly or indirectly, compensation to UniServ Directors," who allegedly engaged in unlawful securities activities. The Commissioner further contends that the NEA violated its duty to supervise the UniServ Directors and must now answer for their allegedly improper conduct. Am. Compl. ¶ 10. By contrast, the NEA argues that the UniServ Directors were subject only to the supervision and control of the ISTA. The NEA denies ever having any duty to supervise these individuals or ever having actually supervised them. NEA Br. at 2. In addition, the NEA disputes that its history of financial assistance to the ISTA suffices as a "connection with an alleged violation of the [Act] to be held liable for the violation." *Id.* at 6.

Our analysis of the NEA's potential liability in this lawsuit necessarily begins with the relevant statutory text. The Act provides for derivative liability of several types of individuals, including:

(1) [a] person that directly or indirectly controls a person liable under [the Act], unless the controlling person sustains the burden of proof that the controlling person did not know, and in the exercise of reasonable care could not have known, of the existence of the conduct by reason of which the liability is alleged to exist[;]

(2) [a]n individual who is a managing partner, executive officer, or director of a person liable under subsections (a) through (c), including an individual having a similar status or performing similar functions, unless the individual sustains the burden of proof that the individual did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist[; and]

(3) [a]n individual who is an employee of or associated with a person liable under subsections (a) through (c) and who materially aids the conduct giving rise to the liability, unless the individual sustains the burden of proof that the individual did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist.

Ind.Code § 23–19–5–9(d)(1)-(3). In *Lean v. Reed*, 876 N.E.2d 1104 (Ind.2007), the Indiana Supreme Court addressed what it meant to be a "controlling person" under the predecessor statute and noted that "[f]ederal courts have interpreted liability of a 'controlling person' to require proof by the plaintiff that the defendant was a 'culpable participant' in the unlawful securities sale." *Lean*, 876 N.E.2d at 1109 n. 7 (citations omitted). The court couched its ruling in tort language, adding that whether a defendant has exercised "due care" depends on factors such as the quantum of its decisionmaking, skill in discerning the truth, and pecuniary interest in the transaction. *Id.*

More recently, and after the recodification of the Act, the Indiana Court of Appeals observed that "[t]he conduct necessary to 'materially aid' a securities law violation appears to be a question of first impression in Indiana." *Schrenker v. State*, 919 N.E.2d 1188, 1195 (Ind.Ct.App. 2010). The court of appeals examined the Indiana Supreme Court's analysis in *Kirchoff v. Selby*, 703 N.E.2d 644 (Ind.1998), which included various definitions of the phrase "materially aid" without officially setting forth a standard. *Schrenker*, 919 N.E.2d at 1195 (citing *Kirchoff*, 703 N.E.2d at 652 n. 7). After considering the definitions cited in *Kirchoff*, the court "adopt[ed] the standard used in *Foley v. Allard*, [427 N.W.2d 647 (Minn.1988),] which requires a substantial causal connection between the culpable conduct and the harm to the plaintiff." *Id.* (citing *Foley*, 427 N.W.2d at 651). The court further acknowledged that the "substantial causal connection" standard is "consistent with common-law tort principles." *Id.* at 1195 n. 7.

Indiana courts considering supervisory issues have relied upon the "retention of control" analysis set forth in Section 414 of the *Restatement (Second) of Torts*, which provides: "One who entrusts work to a[ ] [non-agent], but who retains the control of any part of the work, is subject to liability." *Pelak v. Ind. Indus. Servs.*, 831 N.E.2d 765, 770 (Ind.Ct.App. 2005); *Cummings v. Hoosier Marine Props.*, 173 Ind.App. 372, 363 N.E.2d 1266, 1272 (1977). This particular hornbook section commonly arises in situations involving physical harm, but the guiding principles need only be "consistent" with the issues before us, not identical to them. Thus, we note that Section 414 applies where an entity retains control over "the operative detail of the work" involved. *Pelak*, 831 N.E.2d at 770. We also observe the scope of this rule, as set forth in Comment *c* to Section 414:

> [T]he employer must have retained at least some degree of control over the *manner in which the work is done*. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to

receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. . . . There must be such a retention of a right of supervision that the contractor is *not entirely free to do the work in his own way.*

RESTATEMENT. (SECOND) OF TORTS § 414, cmt. c (1965) (emphases added).

■■■ Here, the undisputed material facts establish that the NEA enjoyed several managerial rights through the UniServ Agreements—namely, to inspect the ISTA's progress, receive reports, and make suggestions. None of these privileges, of course, can definitively establish that the NEA retained full control over the UniServ Directors. Nevertheless, the 2008 UniServ Agreement considerably weakens the ISTA's position that the NEA exercised *no* operative control of these individuals. The following aspects of the UniServ arrangement lead us to conclude that genuine disputed issues of material fact remain: the UniServ Directors' reliance on NEA for a significant portion of their salary; the fact that the NEA could "use each UniServ [Director] for up to 10 working days each year;" the NEA's demonstrated commitment to supervising the UniServ Directors' career development activities; and the NEA's intermittent "review of the total statewide UniServ Program." 2008 UniServ Agrmt. at 4–5. Likewise, the NEA's reservation of the right to "make the final decision" regarding activities it funded belies its insistence that it did not supervise the UniServ Directors. These aggregated facts, as well as the ISTA's proffered testimony regarding who the UniServ Directors regarded as their "supervisor," preclude us at this time from granting judgment as a matter of law in favor of the NEA. Whether the NEA "fell asleep at the wheel" (or, of course, whether the NEA was duty-bound to "steer" at all), so to speak, in its relationship with the UniServ Directors is a determination that must be reserved for trial.

## Conclusion

For the reasons explicated in this entry, the Court: (1) DENIES the ISTA's Motion for Summary Judgment; (2) DENIES the NEA's Motion for Summary Judgment; (3) GRANTS Defendants' collective Motion in Limine regarding the expert testimony of Prof. Hicks; and (4) GRANTS IN PART AND DENIES IN PART the Commissioner's request via surreply to strike evidence from the record. Specifically, with regard to the Collins Declaration, Exhibits 1, 5, and 9 are admitted, and Exhibits 7 and 8 are stricken as inadmissible hearsay. There being no basis for granting judgment as a matter of law in any of the Defendants' favor, the parties are instructed to prepare for trial.

IT IS SO ORDERED.

## ORDER DENYING DEFENDANT'S MOTION TO RECONSIDER

This entry resolves a renewed request relating to the much-publicized efforts of Indiana school employees to recoup funds after one of the state's major insurance trusts collapsed. The dispute originated on December 2, 2009, when the State of Indiana, through its Securities Commissioner ("the Commissioner"), filed a lawsuit in state court against the Indiana State Teachers Association *et al.* ("the ISTA") and the National Education Association ("the NEA"). After Defendants removed the case to federal court on December 9, 2009, on the ground that the NEA is a federally chartered corporation, we assumed jurisdiction over the matter. Over a year later, the Commissioner filed his Amended Complaint [Docket No. 138], alleging four violations of the Indiana Uniform Securities Act. He asserted these claims derivatively with respect to the

NEA, asking the Court to hold the NEA accountable for acts of Indiana's four Unified Staff Service Program employees ("the UniServ Directors").[1] We denied Defendants' motion to dismiss on April 28, 2010. Thereafter, the ISTA and the NEA filed separate motions for summary judgment [Docket Nos. 170, 174], which we likewise denied by order dated March 26, 2013 [Docket No. 206]. Now before us is the NEA's Motion to Reconsider [Docket No. 215], filed on April 9, 2013.

Bearing in mind the protracted nature of the proceedings and the substantial amount of judicial ink previously applied in resolving the parties' various motions, we need only briefly recite the relevant facts. The focal point of this lawsuit is the ISTA Trust ("the Trust"), which offered various health and disability insurance arrangements to Indiana school employees. Under one such plan, the Collaborative Surplus Reserve ("CSR") Program, participating school districts could "receive a return on [their] ... balances,[2] calculated as a return on investment by ISTA and based, in part, on the return earned by ISTA and the [Trust] on their investments." Am. Compl. ¶ 15. The Commissioner asserts that the CSR Program participants have been harmed by Defendants' alleged failure to disclose material information concerning the financial health of the Trust. According to the Commissioner, Defendants did not divulge that the Trust had sustained substantial investment losses and, therefore, could not meet its obligations to CSR Program participants.

*Id.* ¶ 19. Putting aside theories of causation, it is undisputed that the Trust *did* collapse in 2009. The NEA subsequently assumed control of the operations, administration, and assets of the ISTA and its related entities by trusteeship.[3] *Id.* ¶ 23.

Although most of the assertions in the Amended Complaint address the ISTA's allegedly unlawful conduct, the Commissioner also named the NEA as a defendant "because of its operational control of the ISTA Entities" and "because [the NEA] paid, directly or indirectly, compensation to UniServ Directors," who allegedly violated the Indiana Uniform Securities Act. Throughout this lawsuit, the Commissioner has argued that the NEA, having breached its duty to supervise the UniServ Directors, must now be held liable for the losses resulting from the Trust's collapse. The NEA has similarly maintained its resolve that: (1) the UniServ Directors were subject only to the supervision and control of the ISTA; (2) the NEA was never duty-bound to supervise these individuals; (3) the NEA never actually supervised these individuals; and (4) past financial assistance to the ISTA does not justify a finding of liability against the NEA.

At summary judgment, we were unable to conclude that the NEA was entitled to judgment as a matter of law. We denied NEA's motion for summary judgment because, in our view, the evidence in the record did not substantiate the NEA's argument that it lacked managerial rights over the UniServ Directors. Relying on

---

1. The Unified Staff Service Program provides the ISTA and similar organizations with staff and support services needed to implement programs for educators. *2008 UniServ Agrmt.* at 2.

2. According to the Commissioner, some school districts were promised guaranteed rates of return. Am. Compl. ¶ 16.

3. The NEA officially began its trusteeship on May 20, 2009, installing Edward Sullivan as the Trust's acting chief executive officer and sole trustee. Am. Compl. ¶ 10.

the 2008 UniServ Agreement (a document placed in the record by the NEA), we made the factual finding that:

> The following aspects of the UniServ arrangement lead us to conclude that genuine disputed issues of material fact remain: the UniServ Directors' reliance on NEA for a significant portion of their salary; the fact that the NEA could "use each UniServ [Director] for up to 10 working days each year;" the NEA's demonstrated commitment to supervising the UniServ Directors' career development activities; and the NEA's intermittent "review of the total statewide UniServ Program." Likewise, the NEA's reservation of the right to "make the final decision" regarding activities it funded belies its insistence that it did not supervise the UniServ Directors. These aggregated facts, as well as the ISTA's proffered testimony regarding who the UniServ Directors regarded as their "supervisor," preclude us at this time from granting judgment as a matter of law in favor of the NEA.

Docket No. 206 at 30 (quoting 2008 UniServ Agrmt. at 4–5.). The NEA now objects to the foregoing findings in its request for reconsideration of our denial of summary judgment. Specifically, it argues that its lawsuit is the "classic case for reconsideration" because "the Court's denial of [its] motion for summary judgment ... is predicated on ... the Court's interpretation of provisions no party had addressed." NEA Br. at 2.

The NEA brings its motion to reconsider pursuant to Federal Rule of Civil Procedure 54(b), which provides, in relevant part, that "any order or other form of decision, however designated, which adjudicates fewer than all the claims ... is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Rule 54(b) affords a district court broad discretion to amend an order

before entering judgment as to all claims and parties. *See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir.1996). Nevertheless, motions for reconsideration "serve a limited function." *Publishers Res., Inc. v. Walker–Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir.1985). Their narrow scope of applicability emanates from the law of the case doctrine, which carries a "presumption against reopening matters already decided [to] reflect[ ] interests in consistency, finality, and the conservation of judicial resources," *Minch v. City of Chi.*, 486 F.3d 294, 301 (7th Cir.2007), but also authorizes the court to change its mind about a prior ruling. Accordingly, motions for reconsideration may be granted "for 'compelling reasons,' such as a change in the law which reveals that an earlier ruling was erroneous." *Solis v. Current Dev. Corp.*, 557 F.3d 772, 780 (7th Cir.2009); *see also Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 572 (7th Cir.2006); *Starcon Int'l, Inc. v. International Brotherhood of Boilermakers*, 450 F.3d 276, 278 (7th Cir.2006). They may also be granted when the court misunderstands a party, makes a decision outside the key issues before the court, or errs in apprehension (not reasoning). *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990); *United States v. ITT Educ. Servs., Inc.*, No. 1:07–cv–0867–TWP–MJD, 2012 WL 266943, at *8 (S.D.Ind. Jan. 30, 2012).

When ruling on a motion for reconsideration, "the threshold issue [for the court is] whether the factual or legal landscape has changed since [the last decision]." *Agostini v. Felton*, 521 U.S. 203, 216, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *see also Vidimos, Inc. v. Wysong Laser Co.*, 179 F.3d 1063, 1065 (7th Cir.1999). The requirement of changed circumstances "empower[s] the court to change course when a mistake has been made ... [but] do[es] not empower litigants to indefinitely pro-

long a case by allowing them to raise their arguments[ ] piece by piece." *Solis,* 557 F.3d at 780. Additionally, this type of motion it is neither a vehicle for arguments a party should previously have asserted nor "a second[ ] ... or ... third[ ] bite at the apple." *Id.* It is well-settled throughout our federal court system that "[t]here must be an end to litigation someday." *Ackermann v. United States,* 340 U.S. 193, 198, 71 S.Ct. 209, 95 L.Ed. 207 (1950). Therefore, a party who finds himself paddling upstream after a ruling adverse to his interests may not use a motion for reconsideration as a life raft—especially not when his own strategic choices engendered his dilemma. *See Good Luck Nursing Home, Inc. v. Harris,* 636 F.2d 572, 577 (D.C.Cir.1980).

Bearing in mind our circuit's stance that motions to reconsider should be scarce because controlling changes in the law or facts after submission of issues to the court "rarely arise," we can make short work of the NEA's motion. *Bank of Waunakee,* 906 F.2d at 1191. The NEA's argument is not grounded in intervening authority, new and previously undiscoverable evidence, or changed circumstances weighty enough to bypass the law of the case doctrine. *See Vidimos, Inc.,* 179 F.3d at 1065. In fact, the crux of the NEA's motion is that it has not had the opportunity to address the evidence upon which the Court relied at summary judgment—*i.e.,* four provisions of the 2008 UniServ Agreement. NEA Br. at 2. This argument is both puzzling and preposterous. As we noted *supra,* the 2008 UniServ Agreement is part of the evidentiary record because *the NEA included it as an exhibit* in support of its motion for summary judgment. *See* Docket No. 175 Ex. 3 ("Exhibit B— UniServ Agreement 2008"). That all parties have enjoyed access to this document since April 13, 2012 belies the NEA's assertion that it was somehow unavailable to anyone during the remainder of the briefing schedule. Furthermore, having placed this document before the Court, it is disingenuous of the NEA to argue now that the Court's references to it were improper. A district court is not required to ignore contractual provisions—especially not when the language therein bears directly on a disputed issue. *S. Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.,* 302 F.3d 667, 677 (7th Cir.2002). Rather, the court is obligated to *raise* topics the parties have overlooked; "the judge is on the bench ... because of superior legal background, expertise, or credentials, and for that reason '[should] not sit as a passive observer who functions solely when called upon by the parties.' " *Jones v. Page,* 76 F.3d 831, 850 (7th Cir. 1996) (quoting *Gonzalez v. Volvo of Am. Corp.,* 734 F.2d 1221, 1225 (7th Cir.1984)).

Here, the excerpts of the 2008 UniServ Agreement upon which we relied in our March 26, 2013 order are decidedly *not* "outside the adversarial issues presented to the Court by the parties." NEA Br. at 3 (quoting *Bank of Waunakee,* 906 F.2d at 1191). The NEA's request for judgment as a matter of law focused on the issue of whether it "had sufficient connection with an alleged violation of the Indiana [Uniform] Securities Act." NEA S.J. B r. at 6. We therefore examined whether the record evidence established "that [the] NEA neither participated [n]or controlled or supervised" the UniServ Directors. *Id.* Fully apprised of the parties' submissions, we concluded that several aspects of the 2008 UniServ Agreement (compensation, decisionmaking, supervising career development, and "using" the services of a UniServ Director up to ten working days per year) pertained directly to the NEA's core adversarial issues. The NEA has failed to provide any new, significant, contradictory, or binding case law that might persuade us otherwise at this juncture; rather, it merely balks at a decision that was contrary to

its own stated interests. We say again that genuine issues of material fact remain concerning the NEA's role in the Trust collapse; consequently, any determination of the NEA's liability in this lawsuit must be reserved for the jury at trial. Our prior ruling on the NEA's motion for summary judgment stands, and the NEA's Motion for Reconsideration is, therefore, DENIED.

IT IS SO ORDERED.